IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division



| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | 1:11mj 595 |
| ) | |
| TERRANCE KERNEY, ) | |
| STEVE DONOVAN DIXON, ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Edward Warren, being duly sworn, depose and state as follows:

### Agent's Background and Experience

1. Your Affiant has been a Fairfax County Police (FCPD) Officer for eighteen years and is currently assigned to the Criminal Intelligence Division. Your Affiant is a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms and Explosives and has been for the past three years. Your Affiant has written and assisted on numerous search warrants leading to arrests and convictions in the General District and Circuit Courts of Fairfax County, Virginia and the United States District Court for the Eastern District of Virginia. Your Affiant has also purchased narcotics in an undercover capacity, which has led to arrests and convictions in the General District and Circuit Courts of Fairfax County, Virginia, and the United States District Court for the Eastern District of Virginia. Your Affiant has also cultivated and utilized informants which have also lead to arrests and convictions in the General District and Circuit Courts of Fairfax County, Virginia and the United States District Court for the Eastern District of

Virginia. Your Affiant has received formal training through the Fairfax County Criminal Justice Academy, the Eastern Shore Criminal Justice Academy, the Drug Enforcement Administration, Law Enforcement Training Associates, and the Multi-Jurisdictional Counterdrug Task Force in drug and narcotics identification, drug and narcotics investigations, drug and narcotics laws, enforcement of those laws and street-level narcotics investigations. Your Affiant was also previously involved in an ATF operation related to the armed-robbery of a cocaine "stash house." That investigation resulted in the convictions of six individuals in the United States District Court for the Eastern District of Virginia. Previously, Your Affiant was assigned to the Street Crimes Unit in FCPD's Organized Crime Division for eight years. In this capacity, Your Affiant worked on dozens of cases involving drugs and guns.

2. The facts and information contained in this affidavit are based upon my personal knowledge of the investigation, as well as the observations of other law enforcement officers involved in this investigation. All observations referred to in this affidavit that were not made by me were related to me by the person who made such observations.

3. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or other law enforcement officers, or known to the government.

4. This affidavit is presented in support of a criminal complaint charging TERRANCE KERNEY and STEVE DONOVAN DIXON, with conspiracy to affect commerce by robbery, in violation of Title 18, United States Code, Section 1951(a).

**Facts and Circumstances in Support of Probable Cause**

5. On April 20, 2011, Terrance KERNEY met with an undercover law enforcement officer (UC1). KERNEY told the UC that he was involved in large-scale marijuana trafficking

and asked whether the UC was interested. The UC responded affirmatively. KERNEY and the UC exchanged phone numbers.

6. On May 18, 2011, KERNEY met with UC1. UC1 told KERNEY that he was currently paying $4,000 per pound for high-grade marijuana. KERNEY responded that this was "a ridiculous price" and that he could provide UC1 with marijuana for substantially less money. KERNEY told UC1 that this was his business, no one could beat his prices, and he was connected to growers in Humboldt County, California. KERNEY told UC1 that he knew what he was doing and not to worry. KERNEY told UC1 that he would send UC1 marijuana samples (ranging from $450 to $1,400 per pound) via the United States Postal Service (USPS).

7. On June 7, 2011, UC1 received a USPS Priority Mail package containing approximately seven grams of high-grade marijuana. UC1 subsequently contacted KERNEY and arranged to purchase 13.3 pounds of marijuana at $450 per pound. UC1 wired $7,000 to a bank account specified by KERNEY. Delivery of the marijuana was to occur on June 28, 2011.

8. On June 28, 2011, KERNEY told UC1 that he did not have the marijuana. KERNEY explained that he made a bad mistake and lost the money gambling. KERNEY apologized and stated that although "[he] fucked up" he also "figured out a way to make it up to [the UC]." KERNEY told UC1 that he was "scoping out a bank" in his home town, and he intended to commit an armed bank robbery and split the proceeds with UC1. UC1 told KERNEY that the plan sounded risky and UC1 was not interested. KERNEY responded that this is what he does, that UC1 should trust him, and he was fully capable of doing the robbery. UC1 again told KERNEY that he was not interested.

9. KERNEY asked UC1 whether UC1 knew of any "jobs" that KERNEY could do for UC1. UC1 told KERNEY that UC1 was involved with several high-level drug trafficking

organizations, one of which could be a target. UC1 asked KERNEY how KERNEY would get to Virginia and transport weapons and materials needed to commit the robbery. KERNEY replied that he would ship the firearms via USPS. UC1 expressed concern that the guns would be seized en route. KERNEY responded that he had done this previously and knew how to package firearms for shipment via USPS.

10. On June 30, 2011, KERNEY sent a text message to UC1, in which KERNEY stated that he still wanted to "handle this" and asked whether UC1 had time to "figure out what is best." UC1 responded that he may have an opportunity for KERNEY, but that KERNEY would have to make his own travel arrangements to get to Northern Virginia.

11. UC1 told KERNEY that he may need more individuals to accomplish the plan and that it might be best to send the items needed to commit the offense in advance. KERNEY replied that he had no problem sending implements in advance. KERNEY also stated that he only needed one other individual, in whom he had great confidence.

12. UC1 told KERNEY that UC1 would order ten kilograms from his drug source for delivery in Virginia. UC1 further told KERNEY that UC1's drug source included potentially dangerous people. KERNEY stated he would limit the danger if he caught them "sleeping," and directed UC1 to "set it up." KERNEY told UC1 that he needed to send UC1 a package, if UC1 was willing to receive it.

13. Subsequently, KERNEY told the UC that he would mail the implements on the morning of July 5, 2011, and ended his text message with the statement, "im all in."

14. On July 5, 2011, KERNEY sent a text message to UC1 with a USPS tracking number and stated that the package would probably be delivered on July 7, 2011.

4

15. On July 6, 2011, UC1 and KERNEY exchanged text messages. In one message, KERNEY stated "me and my boy is ready to perform."

16. On July 8, 2011, UC1 received a USPS Priority Mail box bearing the same tracking number provided by KERNEY. Law enforcement officers recovered two firearms from the box: a Smith and Wesson .45 caliber revolver and a HiPoint 9mm semi-automatic pistol. Later that day, UC1 called KERNEY. During the conversation, KERNEY told UC1 that UC1 "must be smiling." UC1 responded that one of the guns was similar to something that Clint Eastwood would use. KERNEY replied, "Yeah, Clint Eastwood, yeah, I had to get that out of my closet." KERNEY and UC1 discussed the "drug stash" locations. UC1 explained that the locations were typically small, run-down motels. KERNEY acknowledged that he was familiar with how this worked. KERNEY stated that he assumed the drug source would "chill" at one of the three locations used and UC1 would get a call with instructions on the day of pick-up. UC1 stated that KERNEY was correct, and KERNEY responded, "we're on the same page." UC1 reminded KERNEY that the drug source should be taken seriously. KERNEY responded that he was not taking this lightly and that his method was "quick and swift" and "the less drama as possible."

17. On July 11, 2011, KERNEY sent UC1 a series of text messages detailing that KERNEY and his "partner" purchased plane tickets. KERNEY also provided flight information.

18. On July 16, 2011, KERNEY sent UC1 a series of text messages stating that KERNEY purchased replica police uniforms and equipment, which he and his partner planned to use in the robbery. KERNEY told UC1 that he would send this equipment via USPS to avoid airport security.

19. Several hours later, UC1 received a picture message that depicted KERNEY wearing a police-type uniform, including the words "POLICE" in bold lettering and a badge of the front of the shirt, and handcuffs on his belt.

20. On July 19, 2011, law enforcement officers received a USPS Express Mail envelope bearing the same return address as the package which contained the firearms. Inside the package were: (a) two black novelty ballistic-type vests with "POLICE" hand painted on one side of the vest; (b) two pairs of novelty police-type handcuffs, with keys, with the serial numbers obliterated; and (c) one gold novelty "FBI" badge.

21. KERNEY and DIXON arrived in the Eastern District of Virginia on this same date.

22. Later on July 19, 2011, KERNEY and DIXON had dinner with UC1 and other UCs, in the Eastern District of Virginia. During dinner, KERNEY and DIXON made numerous comments regarding their plans and commitment to conduct the robbery. UC1 stated on a number of occasions that if they ever decided they did not want to commit the robbery that they did not have to but he needed to know. Each time, both KERNEY and DIXON reaffirmed their desire to follow through with their plans for the robbery. Specifically, KERNEY and DIXON discussed the arrangements for the cocaine they would acquire as a result of the robbery. They agreed to a "50/50" split with the UCs of the ten kilograms of cocaine ordered, and later asked if UC1 would sell one or more of the kilograms from their "cut" in order to avoid having to transport it back to Southern California. DIXON stated his desire to construct or obtain entry tools (i.e. ram) to gain access into the hotel room. KERNEY stated he did not want to hurt the individuals they would be robbing but if he had to he would shoot them in the leg or abdomen.

23. KERNEY and DIXON asked UC1 and another UC, UC2, to drive them to the locations where the cocaine "stash houses" were previously located. This occurred on July 20, 2011. Upon meeting with the UCs, KERNEY handed UC1 a plastic hotel-style laundry bag which contained two black, paintball-type masks. KERNEY stated he and DIXON purchased the masks the previous night and intended to use them in the commission of the robbery. DIXON stated "police actually use this" and KERNEY stated that the UCs have only seen a portion of the equipment they intended to use during the robbery.

24. During the car ride, KERNEY and DIXON made numerous statements regarding their planned actions during the robbery, similar to those from previous meetings. KERNEY also asked UC1 if he would sell all five of their kilograms of cocaine, so as not to have to transport the drugs back to Southern California.

25. The UCs showed KERNEY and DIXON the possible "stash house" locations, all of which were in the Eastern District of Virginia. Later, KERNEY and DIXON asked the UCs to drive them to Home Depot, where they purchased the components to what they described as a "ram," a bag of flex ties (improvised restraining devices), a screwdriver and a hammer.

26. Later that night, KERNEY sent UC1 a text message which stated that they just spent hours doing their homework and were very familiar with the potential robbery locations.

27. On July 21, 2011, UC1 and UC2 met KERNEY and DIXON at their hotel, within the Eastern District of Virginia. UC1 and UC2 drove their car to a storage facility. KERNEY and DIXON followed in their rental car. The UCs told KERNEY and DIXON that the UCs had obtained a van for use in the robbery, which they could pick up at the storage facility. The UCs showed KERNEY and DIXON the van inside a storage locker. KERNEY and DIXON moved items, including the "ram" from their rental car into the storage locker.

28. The UCs asked KERNEY and DIXON about the previously shipped firearms. KERNEY and DIXON each identified which gun he would use in the robbery. KERNEY and DIXON took possession of their respective firearms, which had been held in law enforcement custody since the shipment arrived. The UCs suggested that KERNEY and DIXON place their firearms into the van and get dressed. KERNEY and DIXON were arrested as they changed into their police clothing.

## Conclusion

29. Based on the foregoing, I submit that there is probable cause to believe that, from on or about June 30, 2011 to July 21, 2011, in Fairfax County, Virginia, within the Eastern District of Virginia, TERRANCE KERNEY and STEVE DONOVAN DIXON did conspire to affect commerce by robbery, in violation of Title 18, United States Code, Section 1951(a).

I affirm under penalty of perjury that the facts stated in this affidavit are true to the best of my knowledge and belief.

*Edward Warren*
Edward Warren
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to and subscribed before me
this 21st day of July, 2011:
/s/
Theresa Carroll Buchanan
United States Magistrate Judge
The Honorable Theresa Carroll Buchanan
United States Magistrate Judge

Alexandria, Virginia